```
1                    UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF DELAWARE

3

4      INTERDIGITAL COMMUNICATIONS, :  CA NO. 13-8-RGA,

5      INC., a Delaware            :  13-9-RGA, 13-10-RGA

6      corporation,               :  July 12, 2013

7      INTERDIGITAL TECHNOLOGY     :

8      CORPORATION, a Delaware     :  9:00 o'clock a.m.

9      corporation,               :

10     IPR LICENSING, INC., a      :

11     Delaware corporation, and   :

12     INTERDIGITAL HOLDINGS, INC., :

13     a Delaware corporation,     :

14              Plaintiffs and     :

15     Counterclaim Defendants     :

16                                 :

17        v.                       :

18                                 :

19     HUAWEI TECHNOLOGIES CO. LTD, :

20     et al., ZTE CORPORATION, et  :

21     al., & NOKIA CORPORATION, et :

22     al.,                        :

23       Defendants and           :

24       Counterclaim Plaintiffs.  :

25       .............................:
```

```
1                  TRANSCRIPT OF MOTION TO DISMISS FRAND COUNTERCLAIMS

2                  BEFORE THE HONORABLE RICHARD G. ANDREWS

3                       UNITED STATES DISTRICT JUDGE

4

5

6        APPEARANCES:

7

8        For Plaintiffs:     PROCTOR HEYMAN, LLP.

9                            BY:  NEAL C. BELGAM, ESQ.

10                                 -and-

11                           WILSON SONSINI GOODRICH & ROSATI

12                           BY:  DAVID S. STEUER, ESQ

13                           BY:  MAURA L. REES, ESQ

14                           BY:  MICHAEL B. LEVIN, ESQ

15

16

17       For Defendants:     YOUNG CONAWAY STARGATT & TAYLOR

18                            BY:  ADAM W. POFF, ESQ

19                                 -and-

20                           COVINGTON & BURLING

21                           BY:  STANLEY YOUNG, ESQ

22                           For Defendant Huawei

23

24                           RICHARDS, LAYTON & FINGER

25                           BY:  KELLY E. FARNAN, ESQ
```

```
 1                            -and-

 2                   BRINKS HOFER

 3                   BY:  JAY REIZISS, ESQ

 4                   For Defendant ZTE

 5

 6                   MORRIS NICHOLS ARSHT & TUNNELL

 7                   BY:  JACK B. BLUMENFELD, ESQ

 8                            -and-

 9                   ALSTON & BIRD

10                   BY:  PATRICK J. FLINN, ESQ

11                   BY:  MARK A. MCCARTY, ESQ

12                   For Defendant Nokia

13

14

15

16

17   Court Reporter:        LEONARD A. DIBBS

18                          Official Court Reporter

19

20

21

22

23

24

25
```

```
1
2                    P R O C E E D I N G S
3
4              (The proceedings occurred at 9:01 o'clock a.m. as
5        follows:)
6
7              THE COURT:  Good morning, everyone.  Please be seated.
8              Mr. Belgam, you've got some people with you?
9               MR. BELGAM:  I do, your Honor.  Good morning.
10             Neal Belgam for the Plaintiff Interdigital.
11             I have with me David Steuer who will be here addressing
12        the argument this morning.
13             I also have Maura Rees and Mike Leving.
14             MR. STEUER:  Good morning, your Honor.
15             MS. REES:  Good morning, your Honor.
16             MR. LEVIN:  Good morning, your Honor.
17             THE COURT:  Good morning.
18             And for the defendants, Mr. Blumenfeld?
19             MR. BLUMENFELD:  Good morning, your Honor.
20             Jack Blumenfeld from Morris Nichols.
21             I'm here for the Nokia defendants this morning.
22             With me is Patrick Flinn from Alston & Bird.  And also
23        with me is Mark McCarty from Alston & Bird.
24             Mr. Flinn is going to be presenting the argument for
25        Nokia today.
```

```
 1                 THE COURT:  Mr. Poff.

 2                 MR. POFF:  Good morning, your Honor.

 3                 Adam Poff from Young Conaway on behalf of Huawei.  And

 4      with me today is Stanley Young from Covington & Burling.

 5                 MR. YOUNG:  Good morning, your Honor.

 6                 THE COURT:  Good morning.

 7                 Ms. Farnan.

 8                 MS. FARNAN:  Good morning, your Honor.

 9                 Kelly Farnan from Richards Layton & Finger on behalf of

10      ZTE (USA).

11                 My co-counsel is Jay Reiziss from Brinks Hofer.

12                 Mr. Reiziss will be addressing the Court today.

13                 THE COURT:  Thank you.

14                 So welcome to everybody.

15                 I spent quite a bit of time looking at the various

16      things, and I hope that after I've heard from you, I will be

17      able to rule on most, if not all of the motions.

18                 So, go ahead, Mr. Steuer.

19                 MR. STEUER:  Thank you, your Honor.

20                 David Steuer for Interdigital.

21                 THE COURT:  I'm sorry.

22                 What is your last name.

23                 MR. STEUER:  It's Steuer.  That's how it's pronounced.

24                 THE COURT:  All right.

25                 Sorry.  Go ahead.
```

1          MR. STEUER:  Your Honor, as you know, we have four

2     patents-in-suit before you.  They parallel in an ITC

3     investigation.  The '868 investigation.

4          We also have, in this Court, have stayed another action

5     that involves three of these defendants, and that parallels the

6     ITC '800 investigation.

7          In the '800 investigation with a stay, but in the '800

8     investigation, we did just receive an initial determination as

9     we told your Honor.

10         THE COURT:  Right.

11         I gather that you have told me about it, but it's under

12     seal, so it will be a while before I actually see it.

13         MR. STEUER:  That's right.

14         However, the notice incorrectly states that all of the

15     FRAND defenses, the same ones asserted here, were rejected by --

16         THE COURT:  Yes, even though from, I did look at the

17     Apple and Samsung one, and from the way they were rejected in

18     that case, I wouldn't necessarily -- if they were rejected the

19     same way in your case as they were in that case, so what?

20         MR. STEUER:  Well, I certainly think with respect to

21     the French law issue, that they're quite relevant, as they are

22     the same issues that are addressed here.

23         But, in any event, obviously we're dealing with the

24     claims that are asserted in this Court, which are not claims

25     that were addressed by the ITC, although I certainly think it's

1        informative.

2                THE COURT:  Well, certainly when it's available, he

3        plans to read it.

4                MR. STEUER:  And we think that will be in a few weeks.

5        The parties have submitted redactions to the administrative law

6        Judge, and, hopefully, we'll get that out soon --

7                THE COURT:  Okay.

8                MR. STEUER:  -- and give it to you.

9                 So we are asking the Court to dismiss certain

10       counterclaim that are based on FRAND, which is Fair, Reasonable,

11       and Nondiscriminatory License, which is part of a standard

12       program.

13               And we have three problems, which we have with these

14       Counterclaims.

15               The first is that they are all compulsory in the

16       earlier stayed case.

17               THE COURT:  And I wouldn't spend your time arguing that

18       one.

19               MR. STEUER:  Okay.

20               So I do think that's probably stated sufficiently.

21               Secondly, we want to talk about the Declaratory

22       Judgment claimed.

23               We believe that they are ripe under Third Circuit law,

24       and if they were ripe, I don't think that they're the sort of

25       things this that Court should take up for a number of reasons.

```
 1                    THE COURT:  All right.

 2                    And, so, basically, there's two parts to the analysis.

 3                    There's kind of a legal part and then there's a

 4      discretionary part.

 5                    MR. STEUER:  That's right.

 6                    If there's jurisdiction, then it goes to the Court's

 7      discretion.

 8                    THE COURT:  Right, right, right.

 9                    The legal part has to --

10                    MR. STEUER:  Yes.

11                    THE COURT:  -- result in their favor or I don't get to

12      the discretionary part.

13                    MR. STEUER:  Exactly, your Honor.

14                    And then, finally, we want to talk about the French law

15      claims and why we believe that there isn't a good claim there --

16                    THE COURT:  Okay.

17                    MR. STEUER:  -- and it should be dismissed.

18                    First, I want to perhaps, talk a little bit about the

19      scope of what these Declaratory Judgment claims involve.

20                    They're asking the Court to set a FRAND rate for

21      Interdigital's U.S. declared patent portfolio.

22                    THE COURT:  Right.  Which, I take it, is larger than

23      the four patents that are at issue in this case, or however many

24      patents are at issue in the other case.

25                    MR. STEUER:  Well, that's certainly the case.
```

1         There are 500 declared, or deemed declared patents in

2    this area, and another 500 applications.  And, presumably, they

3    want the Court to give them a license to the applications as

4    they mature as well.

5         And by comparison, with Judge Robart in Washington, he

6    was looking at 27 patents.  And this Court's task could be

7    looking at 500 patents, and assuming they wanted coverage, 500

8    applications that are currently pending U.S to determine the

9    value of those, which ones are essential and licensed, and which

10   ones would not be essential and unlicensed.

11        And it would be quite a challenge.  It's not a

12   challenge that any Court, that I'm aware of, that has ever

13   undertaken.

14        THE COURT:  I was wondering about that.

15        In the Microsoft case, which is frequently cited by the

16   parties, I gather the Judge there did have a FRAND trial?

17        MR. STEUER:  What he did was, he had a bench trial to

18   determine a FRAND range, and a FRAND rate, for the 27 patents at

19   issue in that case.

20        THE COURT:  All right.

21        And, so, other than that Judge, has there ever been a

22   Court that's actually had a FRAND trial?

23        MR. STEUER:  I don't believe there's a Court that has

24   gone to trial on it.  There are two other Courts that have

25   embarked down that road.

1          There was the Rembrandt case here before Judge Slight

2     in Delaware and then there was the Apple/Motorola case before

3     Judge Crabb in Wisconsin, but it --

4          THE COURT:  Yes, I kind of saw what happened on that

5     one.

6          MR. STEUER:  Yes, he didn't --

7          THE COURT:  I didn't, for various reasons, I didn't

8     look at Judge Slight's case so much.

9          MR. STEUER:  Yes.  They both went off the rails as they

10     got closer to trial.  The plaintiff, who had asked for the

11     proceeding, waffled on it, essentially.

12          THE COURT:  Right.  I saw that definitely Wisconsin.

13          MR. STEUER:  And, also, in the Microsoft and Motorola

14     case, the plaintiffs were not in the trial that was held, so the

15     parties weren't identifying validity or infringement.

16          In this case, as I read the Declaratory Judgments, it's

17     certainly Nokia's request for Declaratory Judgment says it wants

18     a license that is limited to an obligation to pay for a valid

19     and infringed essential patent.

20          I do think it's a task that no Court has undertaken.

21          And, as I imagine it, it would be truly a colossal

22     task.

23          THE COURT:  Let me just ask, because -- and I recognize

24     that this is not part of the pleadings at this point -- has

25     InterDigital made a FRAND offer to any of the three defendants?

1              MR. STEUER:  Well, the answer to that would be, we've

2       made FRAND offers to all the defendants, yes.

3              THE COURT:  Okay.

4              MR. STEUER:  I believe when they get up, they might

5       disagree with it.

6              THE COURT:  No, no.  I'll understand their argument

7       that they're not FRAND.  Part of my difficulty, in reading the

8       pleadings is, there are a lot of conclusory notes about what

9       exactly happened in the past.

10             MR. STEUER:  Right.  And one of the difficulties we

11      have is that the parties have executed non-disclosure agreements

12      which limit what we can present to a Court.

13             THE COURT:  Well, I don't know.  I sort of suspect that

14      I can trump that.

15             MR. STEUER:  I think you can trump me.  If you want me

16      to tell you, I will certainly tell you, but we haven't discussed

17      it.  The defendants have been similarly reticent in --

18             THE COURT:  Okay.  No, I can appreciate -- I can

19      appreciate that.

20             I think right now part -- if the defendants don't come

21      forward with some more information, you know, the things that

22      you tend to look at, in terms of Declaratory Judgment, it's hard

23      to say whether they've stated a plausible case for doing such a

24      thing.

25             Vagueness in this area only helps you, right?

1           MR. STEUER:  Well, I would hope so.  I would hope so.

2           Because we don't believe that there's any way that you

3    could make this concrete enough to be a good use of time.

4           For example, they won't --

5           THE COURT:  Well, let me just ask that, because there's

6    a -- okay.

7           So InterDigital has 500 declared essential patents that

8    apply to telephones, let's say.

9           What if I just said, Well, the four that are at issue

10   in this case, there're pretty -- they seem to be ripe?

11          MR. STEUER:  On the ones that are on the current

12   telephones, the 500?

13          THE COURT:  Well, the four that are the subject of this

14   litigation.

15          MR. STEUER:  Yes.

16          Well, here's what they want on the four.

17          They don't want an injunction on the four, and if they

18   want a license on it, in the sense of a continuing royalty, I

19   think they've already given the Court FRAND defenses.

20          They argue for a Declaratory Judgment.  Although, I

21   think it's a defense that InterDigital would not be entitled to

22   an injunction, there are cases where Courts have looked at

23   e-Bay, or similar doctrines, and decided that an injunction is

24   not appropriate.

25          And although there are no compulsory royalties, there

```
1    have been continuing royalties, and those have been decided by

2    the Court after the liability finding.

3            That may be appropriate here if they make a showing.  I

4    don't believe they'll make a showing.  But if they convince the

5    Court that we're not entitled to an injunction --

6            THE COURT:  All right.

7            So why don't you run through the Declaratory Judgment

8    factors, which -- what are they -- adversity of interest,

9    practicality, and finality, or something like that?

10           MR. STEUER:  Well, if you look at the Third Circuit law

11   on this, there's the question is not there is a dispute between

12   the parties.  Obviously, the parties are in dispute.  The

13   question is whether it's ripe for a Declaratory Judgment ruling.

14           And, so, the Third Circuit looks at three factors.

15           They look at whether it's contingent on other findings,

16   or other events, whether it would be conclusive --

17           THE COURT:  Well, whether it's contingent on other

18   findings or other events, doesn't that really boil down to what

19   the level of the commitment of the defendant is in taking a

20   FRAND license?

21           MR. STEUER:  That is certainly a big contingency.  Yes,

22   I would certainly say that.

23           And in two of the three cases where the plaintiffs said

24   they were, they ultimately were not.

25           THE COURT:  Right.
```

1          MR. STEUER:  So, no, I don't know of a doctrine where a

2     position can't be changed later on in the case.  Maybe you could

3     sign in blood or something.  But all of those cases weren't

4     forwarded on the belief that Rembrandt and the Apple case, on

5     the believe that this would be some sort of final decision, but

6     it turned out that that would not be the case.

7          But I think even more significant, it has to be

8     conclusive to be ripe.  And what they are asking for addresses

9     one term of a patent license, which is the royalty rate, but

10     that leaves a host of material terms undetermined.

11          For example, how long is the license?  What's the

12     payment frequency?  What is the license?  Is it units or is it

13     standards.  Is it units that are only capable of 3G transmission

14     under a standard, or actually employing that particular 3G

15     standard?

16          And even worse, they are only seeking a U.S. only

17     license, and that is sometimes referred to as reverse hold-up.

18     It's not only not conclusive, it leads to multiplicity.

19          And, in fact --

20          THE COURT:  Well, that's an interesting thing, because

21     there does seem to be a point -- a point of dispute.

22          And if this was addressed in the various professors

23     Declarations, or somewhere else -- I glossed over it without

24     catching it -- but the ETSI, is that -- is the irrevocable

25     commitment to a worldwide license, or to a license, a U.S.

```
 1      license that's in U.S or what?

 2              Because, presumably, your U.S. patents don't give you

 3      patent protection in India, do they?

 4              MR. STEUER:  No.  You have to rely on the India

 5      patents.

 6              THE COURT:  So, U.S. patents, if you think about what

 7      the purpose of the ETSI is, why would they want -- why would it

 8      -- why wouldn't a U.S. license be what a FRAND license would be

 9      about?

10              MR. STEUER:  Well, I think you have to look at -- first

11      of all, the ETSI commitment is just being prepared to grant

12      licenses.  It doesn't speak to the geographic sphere.  In fact,

13      there is no law that limits it to a geographic sphere, and I

14      think you have to look --

15              THE COURT:  But if you look at the underlying purpose,

16      what sense does it make for ETSI to say that you have to be

17      prepared to grant a license, and it has to include Antarctica?

18              MR. STEUER:  Well, first of all, they wouldn't care

19      about Antarctic, of course, because they don't sell -- but you

20      are raising the exact problem of the reverse hold-up.

21              And you have to look at the ETSI in the industry

22      practice.  The industry practice is worldwide licenses and

23      that's been -- that's been generally recognized.

24              But the problem with saying to a company, We're going

25      to have your license here in the U.S., in India, in China, and in
```

1    France.  They're all going to be separate proceedings.

2             This was actually addressed by Nokia in a brief to the

3    Federal Circuit in an amicus brief.

4             And here's what they said.  It's a very short quote,

5    but it really explains it.

6             "To adequate enforce its rights, a patentholder could

7    be forced to litigate against every manufacturer of standard

8    compliant products in multiple forms across the world to insure

9    that all covered sales would be compensated.  This, in turn,

10   would result in a greater multiplication of patent litigation,

11   creating a greater drain on the Courts."

12            So that's the situation for the U.S. licenses only and

13   these are foreign companies.  It gets them out of the U.S., but

14   enforces the license holder to start all over with new

15   negotiations and new processes in an attempt to get compensated

16   for the use of the intellectual property.  And that's why, in

17   the industry, the practice --

18            THE COURT:  But what I don't understand is, if Nokia

19   sells phones that practice all 500 of your patents in India, do

20   you have a beef with them?

21            MR. STEUER:  Well, we certainly do, if we have patents

22   in India.

23            THE COURT:  Well, right.  But if you have patents in

24   India, it's not because of your U.S. patents.

25            MR. STEUER:  Right.  But the point is that we're trying

1      to arrive at agreements, License Agreements with these parties,

2      and the Courts sometimes annex to a strategy.  And if you tend

3      --

4            THE COURT:  Right.  To both of your strategies.

5            MR. STEUER:  Well, that's certainly true, which is why

6      I think the Courts have stayed out of either one way or the

7      other of these by doing Declaratory Judgments.

8            However, in fact, I will tell you that the Motorola/

9      Microsoft case is a worldwide license.  That's the rate and the

10     judgments there in addressing the world.

11           THE COURT:  Right.  I think that there was a certain

12     amount of agreement between the parties as to what was going on

13     there.  That may not be the case here.

14           MR. STEUER:  Well, I think it's the case where the

15     parties don't have any agreement.

16           But, nonetheless, it's a huge difference from the

17     perspective of -- and what we're looking at here is, just to

18     bring it back a little bit, is it a conclusive judgment that

19     will end the dispute between the parties?

20           Instead, if you limit it to a U.S. only license

21     determination, you just launched the parties into other fora.

22           THE COURT:  That's the key word, other fora.

23           I mean you're not telling me that if the license

24     doesn't end all disputes between Nokia and InterDigital

25     worldwide, it's not conclusive if it resolves your dispute in

```
1      the U.S.?

2            It seems to me that's conclusive.

3            MR. STEUER:  I would say that you have to look -- I

4      would suggest the Court should look at what a conclusion to a

5      dispute is in the broader sense.  It really ends the specific

6      dispute that's being addressed in Court.

7            Now, I think that Nokia, at our last hearing on June

8      10th said, The problem is it doesn't want to do any more

9      litigation.  It's tired of being sued and wants to have a

10     conclusive process here.

11           But for the U.S. only license, it is only limited to a

12     certain subset of patents.  Remember, they don't want a license

13     to patents that are not necessarily declared essential, but they

14     believe that --

15           THE COURT:  Well, no.  You have no obligation to give

16     them a license to non-essential patents, right?

17           MR. STEUER:  Yes, I don't, but I just want to circle

18     back to the point of will litigation be stopped, will litigation

19     be solved, or the parties have affirmed?  There is no --

20           THE COURT:  Well, I would tend to think that it's not

21     -- the global view of conclusiveness is probably not what the

22     Third Circuit had in mind, but --

23           MR. STEUER:  Well, I think it's -- since the

24     Declaratory Judgment decision is --

25           THE COURT:  Well, let me -- to put a fine point on it.
```

1          I mean how much of your Declaratory Judgment argument

2    really depends -- isn't your big point just, it's hard to say

3    that it will even be conclusive on this dispute, or this a

4    little narrow dispute.

5          MR. STEUER:  Oh, absolutely.

6          And you're only -- I mean, frankly, the way these

7    parties will conclude their dispute is by entering into a

8    license, because if you go through this Declaratory Judgment

9    process, and figure out which patents are valid, you value all

10   the patents, you determine which are essential and which are not

11   --

12         THE COURT:  Well, you know, that's perhaps a question

13   for further down the road.

14         But it strikes me that when we talk about a patent

15   portfolio of 500 cases, and if you all were negotiating a

16   license over them, you probably don't come in and do 500

17   negotiations, and then add up the totals.

18         You probably, I would expect, negotiate the portfolio

19   as a whole, and then you don't have to worry about six of them

20   are actually invalid, because you declared them all essential.

21         And at least seems to me so far that if you've declared

22   them essential, then that is something that upon the proper kind

23   of request, you have to enter into FRAND negotiations on, and,

24   you know, that may or may not result in a license.

25         MR. STEUER:  Well, I think, first of all, the Court is

```
 1    right.  We do have portfolio licensing.  It's generally the way
 2    it's done.
 3            That's not what is being requested in the Declaratory
 4    Judgment action.  The Declaratory Judgment is asking the Court
 5    to determine which of these are, in fact, essential,
 6    notwithstanding that they've been declared potentially
 7    essential.  Actually, there is no -- when you declared an ETSI,
 8    you said they may be essential.
 9            THE COURT:  Right.  But that's what triggering the
10    FRAND obligation.
11            MR. STEUER:  Well, actually, I don't believe that's
12    exactly correct.
13            THE COURT:  I'm sorry.  I don't believe that is exactly
14    correct either.
15            Until you declare that something may be essential and
16    you make, I don't know, Paragraph 6, Paragraph 4, whatever it
17    is, the right kind of thing, then it's something that once
18    you've done that, you have the obligation grant a FRAND license
19    upon request?
20            MR. STEUER:  Well, I would say even -- I would have to
21    back away from that on two grounds.
22            First of all, the FRAND obligation doesn't address
23    everything that is declared, because everything that, in fact,
24    is essential.
25            So to be safe, the parties, frankly, to these ETSI's --
```

```
 1        to make sure they don't leave anything out that may be,

 2        essential, but if it's not, in fact essential, FRAND doesn't

 3        apply to it.

 4               So, for example, if you declare Patent A, and patent A

 5        turns out not to be essential to the standard, not withstanding

 6        the fact that it was declared --

 7               THE COURT:  Well, so -- let me just ask.

 8               So, okay, there's maybe 500 essential.

 9               They say, Okay, well, we'd like to -- we'd like to take

10        a license.  Make us an offer.

11               And you say, Okay, We're only going to license you to

12        these four hundred, because these two hundreds, they're not

13        actually essential.

14               You can't presumably come back later and sue them for

15        that hundred, right?

16               MR. STEUER:  Well, first you all, let me -- let me back

17        it up the other way.

18               InterDigital still has to license everything.  It's a

19        Declaratory Judgment action.  We don't want to license

20        everything.  We just want to license what, in fact, are

21        essential.

22               But, yes, if you limit it -- if the Court were to do a

23        Declaratory Judgment and saying, I find that these 275 are

24        essential, valid, and infringed, and the 225, I don't find

25        qualify under those three requirements, which is a requirement
```

```
 1        that Nokia set out for their Declaratory Judgment, yes, if

 2        there's an infringement, since there would be no license to it,

 3        InterDigital would certainly be free to come back and assert its

 4        rights.

 5              So there's nothing about the Declaratory Judgment that

 6        they're seeking right now, which is limited to a subset of

 7        InterDigital's portfolio, that will immunize them from an

 8        infringement claim, if, in fact, they infringed.

 9              THE COURT:  All right.

10              Why don't you talk about the Breach of Contract for a

11        minute or two.

12              MR. STEUER:  All right.

13              Well, the Breach of Contract, it's under French law,

14        but it is a question of law, and because of that, the Court is

15        entitled, and perhaps even obligated under 44.1, to make a

16        decision on that.

17              THE COURT:  Well, let me ask you this on that point,

18        because I gather the two professors that you both have hired

19        work together at the Sorbonne, and probably have some

20        interesting faculty meetings, let's say that I wanted to hire a

21        court law proof, is that something I could do?

22              MR. STEUER:  I think the Court has the ability to

23        retain a court expert.  I don't see anything under rule 44.1

24        that would prevent the Court from doing that.

25              I don't think it's necessary here, because I think it's
```

1     quite clear that they're seeking to enforce a promise that

2     doesn't exist on the contract as they've alleged it.

3          The actual language -- they say there's this agreement

4     to grant a license, a unilateral agreement to grant a license,

5     but there is no language in the contract they point to, which is

6     the ETSI Agreement that says that.

7          It says -- well, it says it's prepared to grant.  It

8     doesn't say does grant or is granting.

9          And you have two, essentially French lawyers, arguing

10    the law.  It's really no different than us and the defendants

11    arguing what the U.S. law is.

12         THE COURT:  Except that I bring my own background in

13    U.S. law for whatever it's worth, which I do not bring about

14    French law.

15         I don't read or speak French, in any way, that would be

16    meaningfully helpful to read me resolving things.  So, I mean,

17    I am thinking about asking parties to consult with their French

18    law professors and telling me -- see if they can't come up with

19    a couple names of people who are U.S. based law professors who

20    are experts in French law.  I'm sure there are such people.

21         I would sort of be interested in an expert who doesn't

22    have an obligation to one party or the other advising me of

23    this.  It seems like the two French law professors, you know,

24    it's like Jane Curtain and Dan Ackroyd.  I am sure there's some

25    -- it's hard for me to tell which one is right.

1          MR. STEUER:  I will say that, speaking for -- I know, I

2     have some reluctance, and, basically, I know the Court wouldn't

3     do this, but I wouldn't want to be in a position where,

4     essentially, the rulings on French law is farmed out to a --

5          THE COURT:  No, no, no.  I mean this would not be

6     secret advice to me.  This would be something that, because I do

7     think that one could also have testimony about this French law,

8     which might be even more helpful than Declarations.

9          I'm not interested in farming it out.  I'm interested

10     in having somebody who's not beholding to one party or the

11     other.

12          MR. STEUER:  Well, I would suggest that not the third

13     party you're thinking of, but the ITC in the '794 did actually

14     address this issue of French law, and did agree with

15     InterDigital's position that what the obligation is --

16          THE COURT:  And what is the '794?

17          MR. STEUER:  That is the published determination in the

18     Apple/Samsung/ITC action that we gave the Court this week.

19          THE COURT:  I didn't see any -- well, you know, in the

20     end, the commission -- I don't know too much about them -- but

21     when I see the little descending footnotes and stuff, I'm not

22     exactly filled with enthusiasm for relying on them.

23          MR. STEUER:  Well, you know, it's process on a very

24     large record, and a very aggressive advocacy, you know, and as

25     with all quasi appellate panels, I mean with the ITC what they

1    did is the ALJ, they obviously -- you don't always get

2    unanimity.

3         THE COURT:  You know, it seemed to me, at least in the

4    Apple and Samsung, you know, most of their decision was, Apple

5    didn't even argue this in front of ALJ.

6         Well, in any event, so I hear you.

7         Tell me what you want to tell me about the contracts.

8    I need to get over to the defendants.  I'm guessing that there

9    might be more than one lawyer who wants to be heard on behalf of

10   the defendants.

11        MR. STEUER:  Your Honor, I will say to the Court that

12   when the '800 initial determination issues, there will be

13   another opportunity for this Court to observe another, not a

14   judicial officer, but a quasi-judicial officer that --

15        THE COURT:  No, no, I mean I read it and there's a lot

16   that is interesting in the Apple and Samsung.  Things that are

17   interesting to me may not be things interesting to you.

18        So, no, I --

19        MR. STEUER:  So what I wanted to alert the Judge to is,

20   both of these esteemed professors testified in the ITC before

21   the ALJ that issued the '800.

22        THE COURT:  Right.  I know you said you don't want me

23   to farm this out to some professor, but I don't want to farm it

24   out to the ALJ's determination of credibility.

25        MR. STEUER:  Fair enough.  I just thought it might be

1    useful to have the Court see the observations.

2              THE COURT:  I don't disagree with you on that.

3              MR. STEUER:  So that might be coming.

4              Well, we believe that the actual obligation is, of

5    course, is the obligation to negotiate in good faith.

6              I know in the oppositions they say -- well, they did

7    plead that, but I looked at the actual Counterclaims, and I

8    don't actually see that particular breach pleaded.

9              And the damages from a breach to negotiate in good

10   faith is not the expectation of a contract that could be

11   reached.  It's the fact of the failure to negotiate it in good

12   faith.

13             THE COURT:  It seems to me there might be other

14   consequences of that, because even if French law is only that

15   you get to negotiating expenses.  And, you know, it's French

16   law.  Maybe that's what it is.  I don't know.

17             It seems to me that if you didn't negotiate in good

18   faith, that might be a reason you get no damages, you get no

19   injunction in terms of the patent litigation.

20             MR. STEUER:  And let me just say that those -- these

21   are pleaded as affirmative defenses.  We're not moving to strike

22   those.  And that is probably where it belongs in this case,

23   frankly, in our view.

24             But in terms of a positive action for Breach of

25   Contract based on ETSI, we don't see that sort of relief as

1      flowing at all from the French law that governs it.

2              THE COURT:  Now, my colleague out in the Northern

3      District of California, Judge Koh, on pretty similar

4      circumstances, she didn't agree with your position, did she?

5              MR. STEUER:  Actually, I think she did agree with our

6      position.

7              In that case, Apple had brought a similar claim.  It

8      wanted to compel Samsung to license based on the French

9      contract.

10             What Judge Koh said was, I'm not saying there is no

11     contract, but there is no contract to license.  What the

12     contract is is a duty to negotiate in good faith, which is what

13     we're telling the Court here as well.  I'm going to allow that

14     Breach of Contract claim to go forward.

15             THE COURT:  I thought she allowed another one?

16             In any event, go ahead.

17             MR. STEUER:  Yes, I think that's the ruling that Judge

18     Koh had there was to allow it to go forward on a Breach of the

19     Duty to negotiate in good faith.

20             But I don't think she entertained or agreed with the

21     notion that there's, in fact, a binding commitment to grant a

22     license rather than a commitment to negotiate in good faith to

23     achieve a license, so I actually think she's quite consistent.

24             THE COURT:  Hold on just a minute.

25             All right.

```
 1              MR. STEUER:  I would just say -- Ms. Rees has corrected

 2      me -- what she didn't let go forward was the claim that --

 3              THE COURT:  They already had a license.

 4              MR. STEUER:  She didn't let that claim go forward.

 5              THE COURT:  Right, right.

 6              MR. STEUER:  She let the other claims go forward.

 7              THE COURT:  Okay.  All right.

 8              All right.

 9              Why don't I hear from the defendants.  I don't have an

10      unlimited amount of time here.  I will give you at least as much

11      time collectively.

12              Do you all have a plan as to how you were going to do

13      this?

14              MR. FLINN:  We do, your Honor.

15              My name is Patrick Flinn and I represent Nokia.

16              I'm going to talk about a couple of things and then

17      Mr. Young is going to address the ripeness issue.  And to the

18      extent that your Honor wants to hear about compulsory

19      counterclaims at all, that is what Mr. Reiziss has spent all

20      night up preparing for.

21              THE COURT:  Well, I he's probably got a winning hand.

22              I don't know whether he wants to debate whether he

23      wants to put it at risk.

24              MR. FLINN:  What I want to do is just -- just lay the

25      groundwork, and my piece is also to talk about the substantive
```

1        Breach of Contract issues and French law issues to your Honor.

2                But I wanted to begin by saying two things.

3                The first is, that we've all sort of agreed to divide

4        it up in this way, but our clients have very particular views on

5        some of these issues, and I may not say it the way that ZTE,

6        like it said, so it's quite possible that Mr. Reiziss may come

7        and just for two seconds give --

8                THE COURT:  No, no.  I do understand that you have

9        distinct clients.  And I certainly understand that they have

10       distinct interests, and that particularly Nokia seems to be

11       branching out a little more from the two Chinese companies.

12               MR. FLINN:  But I think we're going to hopefully be

13       fairly efficient and not repeat each other.

14               The other thing that I wanted to do was -- and then

15       I'm, frankly, going to turn over it to Mr. Young -- is to talk

16       to your Honor a little about just the relationship.

17               What's going on in the ITC is the relationship to the

18       issues here, because some of the things that my colleague said,

19       I agree with, and some of them I disagree with.

20               What I agree with is that I think the decision in the

21       Samsung/Apple '794 case that your Honor has read and looked at

22       is very interesting instructive, because it does give you a view

23       of at least what the majority of the commissioners seemed to

24       feel about the limits of their statutory authority.

25               And they sort of have a view that their statutory

1    mission is to enforce valid patents, unless you can come up, in

2    essence, with a license with the ink drying on it.

3          And when they look at how they distinguish the District

4    Courts that have consistently said, The FRAND obligation is

5    enforceable and contractual, and the things that Judge Posner

6    did, and the things that happened in the Western District of

7    Washington.

8          We're not a District Court.  We don't have to do that

9    sort of thing.  And it's important to understand that what the

10   ITC can and can't do, because the thing I disagree with most

11   with most that was said on the subject, was the suggestion that

12   either '794 or '800 -- it's the '800 that will come to your

13   Honor -- resolved all of the issues that are in our FRAND case

14   or even addressed them, because the ITC cannot statutorily set a

15   FRAND rate.  They don't even say that they can.

16         And there's very little question that in the abstract

17   setting a FRAND rate is something only either a Court or if the

18   parties agree to go to arbitration can do.

19         And, your Honor earlier asked, Has any Court other than

20   Judge Robart done it?

21         The answer is we believe that is correct.  Judge Robart

22   is the first one, with the exception, of course, of Judges in

23   China, which Mr. Young will talk about.

24         I wanted to briefly mention one thing.

25         He said, Well, there's 500 patents and 500

1    applications, and somehow the larger -- the portfolios --

2    somehow they evade the scrutiny of the Court.  If they can have

3    a big enough portfolio, they're immune from having a FRAND rate

4    set.

5             Two things about that.

6             I think your Honor's observation, just like in

7    licensing negotiations, you don't put every patent under the

8    microscope.  The parties select the ones that they think make

9    their side the best.

10            The other thing, of course is, in those 500 patents

11    there are 500 different disclosures.  They will take one

12    disclosure and morph it into dozens of patent applications.

13            It's a far smaller universe of actual inventions, if

14    you will, than simply the number of patents or patent

15    applications, and I wanted to make that observation as well.

16            With that, I think -- oh, one final thing.

17            Your Honor made an observation about the vagueness in

18    the pleadings and that helping their cause.

19            Certainly, it is our view that if your Honor believes

20    that there's something that lacks clarity, or some element

21    missing that we could allege in our -- we would certainly ask

22    leave to -- permission to amend those claims and make them more

23    suspect.

24            And if it comes to talking about what the specific

25    negotiating history is between the parties, when I get back up

```
 1    and I talk about the substantive obligation, I have some very

 2    specific things to say about the history between Nokia and

 3    InterDigital.  Some of them are constrained by the

 4    confidentiality of the --

 5         THE COURT:  Well, I would just point out -- I think

 6    that the Delaware lawyers generally know this -- don't say

 7    anything, and then come back later and ask me to seal the

 8    transcript.

 9         MR. FLINN:  That's exactly what I -- so what I will say

10    is, I believe, is of public record, but there are some details

11    about it that I can help your Honor understand.

12         The things that may not have been pled, certainly can

13    easily plead.  And we can talk about it if your Honor thinks

14    there is something missing that we need to --

15         THE COURT:  Well, I mean, that is kind of where I'm

16    headed.  And, you know, just to give you an indication, when I

17    was looking at this, before I got the submission yesterday that

18    includes Apple and Samsung from the ITC, you know, my impression

19    was -- and Nokia was actually better at this than the other two

20    defendants -- that, you know, there was great length about ETSI

21    and standards and this and that, and, you know, the allegations

22    about the negotiations were, you know, I think one of the other

23    two defendants said, you know, repeated counter- offers by the

24    defendants we're not accepting, or it was just very unclear to

25    me what the history was supposed to be, which I think goes into
```

1     sort of the concreteness of whether or not there's a Declaratory

2     Judgment.

3            And, to some extent, you know, is the history about

4     four patents?  Is it about all the patents?

5            You know, I think if you have a history showing that

6     you have a dispute over one patent, and then you come in saying

7     like a Declaratory Judgment over 500 patents.  You know, that

8     may be a different thing than you saying, I want a Declaratory

9     Judgment over one patent.

10           And, so, when I was looking at Apple and Samsung, all

11    the stuff that is redacted out of that was -- the thing when I

12    was reading your answer, I'm saying, Where is it?

13           And I thought -- you know, and I've been frustrated --

14    and partly it's been lack of attention by myself -- I've been

15    frustrated in this case, because of all the -- because it's hard

16    for me to tell -- you know, when I read a complaint -- and this

17    is, you know, the law doesn't require all this -- but when I

18    read a Complaint, or an Answer, or a Counterclaim, or whatever,

19    if I see a story told that sounds plausible, not only does it

20    meet pleading standards, but it could give me some idea as to

21    how the case should proceed.  And to be more particular here,

22    you know, if the Breach of Contract, and the FRAND, the

23    Counterclaims, if they stay in the case, then there is an issue,

24    for me it seems of, should I put the patent case on first, or,

25    as you have asked, should I put the Counterclaims on first,

1      because Counterclaims might wipe out the plaintiffs' case in a

2      way -- but I don't think plaintiffs' case would wipe out the

3      Counterclaims, unless they just loose, which seems unlikely on

4      the whole.

5            And, to some extent -- so there's kind of what's the

6      minimum pleading standard, you know, which isn't all that high,

7      but there's also the sort of what is pled to persuade me that

8      maybe it makes sense for you all to go first, which I think is

9      probably more than the minimum pleading standard.

10           But, in any event, I digressed.

11           MR. FLINN:  Sure.  Let me take this opportunity, your

12     Honor, to just tell a little bit of that story, and to the

13     extent that it's not in our pleadings, I would ask that this be

14     considered.

15           THE COURT:  Well, and I just -- you know, in terms of

16     pleadings, I did note that Nokia apparently made some offer in

17     January of 2013, which, you know, is when this suit was filed,

18     and so I saw that.

19           But that was the most concrete thing that I saw in all

20     of these answers.  I saw nothing like that in the answers to the

21     other two.  And, of course, even though what is being said about

22     Nokia, you know, there was a date which gave me a little more

23     confidence that something had happened, but even then there's

24     still a lot left to the imagination.

25           MR. FLINN:  Indeed, your Honor, and I think some of it,

1     because of the confidentiality order, that was under seal.

2            THE COURT:  Well, no.  I think that's something that we

3     might need to discuss.

4            MR. FLINN:  Let me sort of step back and sort of paint

5     the broader picture.

6            And let's start with ETSI, and what it is, and why it

7     might have the rules that it has.

8            Before I do that, let me point out one of the things

9     that is potentially significant to -- but a significant detail.

10    They've made Declarations to more than ETSI.  They've made a

11    general Declaration to the ITU, which French law does not apply.

12           So even if you were to find Professor Fages to be the

13    preeminent voice on this issue, you're not dealing with the

14    declarations in the ITU.  With that being said, ETSI is an

15    organization founded in Europe, which their rules say French law

16    applies.

17           You have all these competitors; Samsung, Motorola,

18    Ericsson, Nokia, LG, and they're all getting in a room and

19    they're deciding to -- what the standards are.  And they're all

20    agreed to cross-license each other's patents.

21           Then they have this policy which says, You have to be

22    prepared to grant licenses on FRAND terms to all companies.

23    Anyone that wants to practice the standard.

24           Now, why would that be?  Why would all of these

25    competitors, getting together in a room, now they've outlawed

1        smoking in Europe at the time, so it's not a smoke-filled room,

2        but it's a room.  There are all of these horizontal competitors

3        getting together to set these standards.

4               Why on earth would they feel like they need to have, in

5        essence, relinquish, theoretically, some of their patent rights?

6               Well, if you look expressly at the policy of ETSI, that

7        is to make the technology available.  It's a fruitless purpose

8        to get in a room and decide all of these standards if no one can

9        implement them.

10              But it's very clear -- and this is something we can

11       certainly have an actual factual basis to it -- that there were

12       competition law concerns.  That FRAND is the safety valve, if

13       you will, that keeps this process going.

14              No one doubts the pro-competitive benefits of a

15       standard setting, but if the competitors are all allowed to get

16       together and cross-license each other's patents, and exclude

17       newcomers from the market without that safety valve of FRAND,

18       then everything -- that that's a process that has to be viewed

19       in an entirely different light.

20              And everyone believed up until now that you are not

21       committing some gross violation of competition laws, as long as

22       FRAND is your real obligation.

23              Now, let's turn specifically to the individuals in the

24       room, the individuals making proposals to be part of the

25       standards.  It is actively sending its lawyers out patenting

1    everything they can possibly patent that comes out of those

2    standards bodies, and making the irrevocable commitments to

3    grant licenses.

4           Now, one of the things that Nokia believes is that

5    InterDigital has claimed to have a lot more essential patents

6    than they really do.

7           And they've litigated that on a couple of occasions.

8    They've got a case pending in this Court that's been stayed by

9    stipulation under the Lanham Act, which alleges that their

10   statements of declaration essentiality violates the Lanham Act.

11          That case was assigned to Judge Farnan and it has been

12   stayed since the institution of the '613 ITC investigation by

13   stipulation of the parties.

14          THE COURT:  Did it get reassigned to somebody?

15          MR. FLINN:  It has not been reassigned.

16          THE COURT:  Oh.

17          MR. FLINN:  It might end up with your Honor for some

18   reason.

19          The stipulation calls for it to remain stayed pending

20   the final end of the '613 case, so it's not in any imminent

21   danger of being resurrected.

22          THE COURT:  Okay.

23          MR. FLINN:  But it was the first time Nokia in the

24   original -- I'm sorry -- started litigating the question of

25   essentiality.

1              In the United Kingdom -- and this is a very significant

2       event that you should know about -- Nokia actually filed an

3       action challenging the actual essentiality of the patents, the

4       U.K. patents, that InterDigital had declared to be essential.

5              And at the time InterDigital had 30 odd patents.  When

6       it came down to trial, InterDigital only was willing to come

7       forward with four patents to say these are the ones that we

8       really think are essential.

9              And after a trial, the U.K. Judge says three of them

10      are not essential, and the fourth one is, but it's already

11      licensed to Nokia under another agreement.  So at the end of the

12      day, they had no essential patents in the U.K.

13             Now, let's move forward to the rounds of negotiations.

14             InterDigital has said that they will only grant a

15      worldwide licenses, and they will require payment of royalties

16      on all products, regardless of where they are made and sold.

17             So in order to get a license to the U.S. patents, they

18      are requiring us to pay a royalty on the sales in the U.K.,

19      where at least as of the time of that judgment, they had no

20      essential patents whatsoever and to which we had no obligation

21      to pay royalties.

22             And that is one aspect of the negotiating history.

23             And I think we can allege that we have actually offered

24      to pay their portfolio rate in the United States, prepared to

25      cut the check for their entire United States portfolio.

1                They won't accept it, because they are insisting on

2       royalties on sales for which they have no patent rights

3       whatsoever.  And that is our facts that can be alleged about

4       their abuse of the negotiating process.

5                But let me talk -- let me step back a little bit and

6       talk about why it is that their view of the FRAND obligation is

7       simply wrong, and it really doesn't make sense, why Professor

8       Fages -- we believe your Honor is perfectly entitled to retain

9       your own expert and get your own advice on the French law issue.

10               We believe that the -- when you look at -- when you

11      play out Professor Fages view, versus Professor Aynes' view, or

12      the Fages' view, it just simply can't be reconciled with what is

13      said in the ETSI document itself, or the policies underlying it.

14               Professor Fages' view is actually broader than what

15      InterDigital counsel told you it was.

16               They said the obligation is to negotiate in good faith.

17      If you look at Professor Fages' Declaration, he doesn't say that

18      at all.  The obligation is simply to negotiate.

19               Now, they don't have to even make an offer, much less a

20      FRAND offer under Professor Fages' view.

21               I call it the accord de principe.  And I'll spell that

22      for you later, sir.  We call it the accord de principe that

23      Professor Fages talks about.

24               THE COURT:  You're suggesting that I'm not fluent in

25      French?

1           MR. FLINN:  I'm assuming you're not.

2           But the -- his version simply is, you have to answer

3     the phone when it rings.  You have to entertain any offers that

4     get made.  You have to entertain counter-offers.  And, most

5     importantly, you never have any obligation to actually reach a

6     license.

7           Now, where the ETSI obligation in writing says, You

8     have to be prepared to grant licenses, in Professor Fages'

9     world, you never have to come up with a license.

10          Now, how an obligation to grant licenses can somehow

11    produce -- allows a process that never results in a license,

12    just simply cannot be reconciled with the language there.

13          Now, Professor Aynes, on the other hand, refers to the

14    French Doctrine of the stipulation pow autri.

15          And I was adopted because I had the best French accent

16    among the group.

17          THE COURT:  It sounds good to me.

18          MR. FLINN:  It is not unfamiliar at all to the U.S.

19    Courts -- it's a third-party beneficiary.  The contract is

20    between the two identified parties, ETSI and the ETSI member,

21    but there are a class of beneficiaries entitled to take

22    advantage of that contractual obligation.

23          And that is a -- that's the only way that the ETSI goal

24    of insuring that the standard can actually be practiced makes

25    sense, because under Professor Fages' view, the obligation is to

1     simply answer the phone.  You could never require any license.

2     And, thus, the standard could well be blocked by patents with

3     people complying with Professor Fages' view of the obligation.

4              It just does not accord at all with the expressed

5     purpose and certainly from a competition law perspective.

6              If you allow a bunch of horizontal competitors to get

7     in a room, and agree that the only thing they have to do to any

8     newcomer into the market is to answer the phone, and beyond that

9     they don't have to do anything, that certainly would have been

10    of interest to competition law authorities when that rule was --

11    when that rule was announced in the formation of ETSI developing

12    the policies.

13             And I think if your Honor looks at what ETSI expressly

14    said, the purpose of its policy was, as well as considering the

15    atmosphere under which it was created, and the consequences of

16    accepting Professor Fages' view, well, you certainly can resort

17    to a French law expert.  You may not need to.

18             My final point, and then I'll turn it over to Mr. Young

19    if that's okay, is to just mention a little bit about what is

20    going to in the ITC, because I think that could affect what

21    happens and when it happens.

22             As your Honor knows, we have a decision from the

23    administrative law Judge in the '800 case.  That is currently

24    being sought for review.

25             InterDigital is petitioning for review, because the

1     patents were found either to be non-valid or non-infringed, or

2     in some cases both, and, so, they are petitioning for review.

3          We are saying if you are going to review that, take a

4     look at some of these other issues.

5          The commission will rule within 60 days.  Make its

6     decision about what to do.  They could ask for further briefing.

7     They could, as happened in Apple and Samsung, reverse it and

8     say, Well, the ALJ found no violation.  We do find a violation.

9          If they do find a violation, which could happen as

10    early as 60 days from the date of the ID, then there is a 60-day

11    period in which the parties can go -- the losing parties can go

12    to the U.S. TRF President designee to try to convince that

13    person to overturn the ITC decision.

14         But then it is self-executing.  Customs starts

15    excluding products at the border.  It does not require the

16    intervention of the complainant to have that happen.  It is --

17    the Government process starts ruling -- working and there is no

18    stay pending appeal.

19         THE COURT:  I understand that if that happens, the case

20    will likely settle.

21         MR. FLINN:  The coercive effect of that risk is

22    certainly one of the reasons why the ITC is where InterDigital

23    has gone.

24         And, so -- and bear in mind, that could happen without

25    anybody deciding what a FRAND rate is.  And with the ITC taking

1    the position as it has, as your Honor sees Apple/Samsung case,

2    about its constrained role with respect adjudicating the FRAND

3    questions.

4           I want to make sure that your Honor was aware of that,

5    because it may or may not be particularly important to us here

6    in this Court down the road.

7           With that, I'll turn it over to Mr. Young.

8           THE COURT:  Okay.  Thank you.

9           MR. YOUNG:  Good morning, your Honor.

10          THE COURT:  Good morning.

11          Thank you.  Stanley Young for the Huawei defendants.

12          I would add to Mr. Flinn's description of why we have

13   not pled more in our Complaint, there are non-disclosure

14   agreements between each of the defendants and InterDigital that

15   covers the negotiation histories between them.

16          And, in fact, although the outside counsel, during the

17   course of the ITC proceedings have seen those negotiation

18   papers, our respective clients are not supposed to see them.

19   InterDigital obviously doesn't want --

20          THE COURT:  Your clients don't know what negotiations

21   are being done on their behalf?

22          MR. YOUNG:  The clients don't know what negotiations,

23   other potential licensees have been having.  They obviously know

24   their own negotiations.

25          So our client, for example, knows what it itself has

1    proposed.

2          THE COURT:  Well, you know, part of the allegations, I

3    guess in all the answers, there's at least a hint of not only

4    fair, and reasonable, but non-discriminatory issues?

5          MR. YOUNG:  Yes.

6          THE COURT:  You know, it suggests to me, but not all,

7    that various defendants have some knowledge of what InterDigital

8    has licensed its patent portfolio, or these patents, or

9    something to other parties issues.

10          MR. YOUNG:  There's some knowledge.  There is some

11    public information, for example, about the prior InterDigital

12    Apple negotiations.  Through SEC filings there is some

13    knowledge.  There's other knowledge that is confidential that

14    the expert witnesses have been looking at, and will look at, and

15    will be able to present in this Court once a Protective Order is

16    in place.

17          I think Mr. Poff and Mr. Mr. Belgam have been

18    exchanging drafts of a Protective Order for this case, which

19    hopefully will be put in place soon.  There also needs to be an

20    amendment to the ITC Protective Order to allow all the

21    information that has already been disclosed there to come into

22    this Court.

23          And once all of that occurs, which I hope will be very,

24    very soon, we will all be in a position very quickly to give you

25    a great deal of detail and specificity about all of the

1    negotiations that have happened between InterDigital and each of

2    our respective defendant clients.

3         Part of that negotiation, I should mention -- and,

4    again, I don't want to violate the Non-Disclosure Agreement

5    here, which does cover the specifics of the negotiations between

6    the Huawei defendants and InterDigital -- but part of what

7    affects that is the Chinese judgments that Mr. Flinn mentioned

8    earlier.  There has been a litigation going on in China since

9    2011, between InterDigital and Huawei, to set a FRAND rate.  And

10   like Judge Robart in the Microsoft/Motorola case, the Chinese

11   Court has set a rate, and, actually, InterDigital announced that

12   in its SEC filings, so there is a rate of .019 percent for the

13   Chinese patents only.

14        And it's under appeal now.  At some point, though, that

15   judgment will become final, and Huawei's view is that that

16   judgment should govern the rate that InterDigital should be

17   entitled for to a license to its Chinese patents.

18        So that process does occur.  It occurred in the

19   Microsoft/Motorola case where -- and I want to correct something

20   that Mr. Steuer said.

21        I think he said that in that case the infringement and

22   validity of the Motorola patents was not being contested.

23        I think that's wrong and we have to recall the context

24   of that case.  There was an impending German injunction that

25   Motorola was going to get against Microsoft to ban X boxes and

1    other Microsoft products in Germany.  And Judge Robart actually

2    enjoined Motorola from enforcing that injunction.  That was

3    affirmed by the Ninth Circuit.

4         And then he went ahead and had a trial on what is the

5    FRAND rate for the patents that Motorola is asserting against

6    Microsoft?

7         And he came to a judgment.  And I think that case

8    demonstrates that with respect to all of the issues with -- on

9    ripeness, adversity, and conclusiveness, and the utility, that

10   this Court should do the same thing.

11        Mr. Steuer mentioned there are many patents and patents

12   applications.  As Mr. Flinn mentioned, and I agree with this,

13   those can be grouped, and it would be a manageable, doable

14   process that would result in clarity, and I believe would

15   resolve infringement and invalidity issues.  It would get rid of

16   the need for this Court and the ITC to continue with this

17   litigation.

18        THE COURT:  You mentioned the Microsoft Judge Robart

19   case.  You said the patents at issue, or something like that,

20   and I think Mr. Flinn, or somebody said 27 patents; is that one?

21   Am I confusing that with something else or was it that one that

22   was being cited in that trial?

23        MR. YOUNG:  I think that's what Mr. Steuer was looking.

24   I don't know whether that count is correct.  I know it had to do

25   with --

1              THE COURT:  What is it that you --

2              MR. YOUNG:  He may be correct.  I just haven't checked.

3              THE COURT:  Okay.  What is it -- you know, maybe I was

4     less than certain -- in terms of your Declaratory Judgment

5     seeking a FRAND rate, what exactly is it that you are seeking a

6     FRAND rate for?

7              MR. YOUNG:  For the U.S. to declare essential 3G and 4G

8     InterDigital patents.

9              THE COURT:  And, in your view, is that something that

10    if I were to undertake that, you know, in extremely simple terms

11    to basically, I guess an expert from your side, and an expert

12    from their side who says -- well, it may be multiple experts --

13    but, essentially in the end, some sort of economic licensing

14    expert, somebody who says, A fair, reasonable, and

15    non-discriminatory rate for the portfolio is X cents a unit, X

16    dollars a unit -- I don't know what -- and, presumably, whatever

17    your expert would say, would be less than what their expert

18    would say.

19             And, in your view, it's something that the experts

20    might -- the economic experts might have, patent law experts, or

21    somebody else, to sort of evaluate the technological work of the

22    portfolio, but, in the end, the bottom line is that I would get

23    sort of two -- two competing numbers.

24             And, so, besides from the technological experts, to the

25    extent that there are licenses that InterDigital had given to

1    other telephone suppliers, whatever kind of suppliers we are

2    talking about here, that would be factored into the economics

3    experts' opinions?  Is that kind of how it would -- that -- that

4    would be the essence of what the trial would be about?

5          MR. YOUNG:  Yes, your Honor.  That's what Judge Robart

6    did.  It would be based on an evaluation from at least a

7    non-discrimination part of the FRAND requirement, to look at

8    InterDigital's licensing history.

9          I will tell you -- and this is public information --

10   InterDigital, just to give one example, entered into a license

11   with Apple in 2007.  And there was a press report that said that

12   Apple paid an extrapolation from some SEC filings, that Apple

13   paid $60 million for that license in 2007.

14         That's just one data point out of many.  There are many

15   that are under seal and, therefore, we can't talk about them

16   right now.

17         There would also be experts that talk about the

18   InterDigital patent portfolio, and what its relationship is to

19   the standard.

20         How valuable are they?  How do they compare to the

21   prior art?

22         And Judge Robart looked at all that and came to his

23   decision.

24         THE COURT:  And, so, what did Robart do about what Mr.

25   Steuer, I think rightly says, for lack of a better word,

1     peripheral aspects of the contract?  I'll say price -- price per

2     unit.  That's not the only thing that you would do in a

3     licensing agreement, right?  Once Judge Robart determined the

4     rate, do we know what happened after that?

5          MR. YOUNG:  Well, that's a great question, your Honor,

6     and it is shows the usefulness and actually conclusiveness of

7     what of Judge Robart has done.

8          There has been on allegation of a FRAND violation in

9     the Microsoft/Motorola case.  He has set the FRAND rate, and a

10    FRAND range, in order to lay the groundwork for a later trial,

11    which is scheduled for later this year on whether Motorola has

12    violated its FRAND commitments.

13         And the value of that rate set that he has done is to

14    be able to then to take that and go to the jury and say -- and I

15    think he's ruled in the context of that case that it is a jury

16    trial -- that the jury then decides, from a Breach of Contract

17    standpoint, whether what Motorola and Microsoft have done with

18    each other meets the FRAND obligation that Motorola has or not.

19         So, from that standpoint --

20         THE COURT:  And I'm sorry.  How does -- other than by

21    agreement of the parties -- how does it come to the

22    determination that the FRAND rate is something the Judge can do

23    and not the jury?

24         MR. YOUNG:  It's an equitable issue.  It's a right that

25    the parties have under the contract.

1            I think we can brief that issue.  I mean --

2            THE COURT:  Well, no.  I'm not looking for more

3    briefing at this point.

4            All right.  Go ahead.

5            MR. YOUNG:  Well, getting to the three aspects of the

6    ripeness issue, I think they're on contingency and adversity.

7    There is adversity here.  I mean that's why we're here.

8            We've been sued.  Our clients have been sued in this

9    Court twice.  They've been sued in the ITC twice.  Actually,

10   Nokia has been sued more than twice in those fora.

11           And the disagreement as to the FRAND rate is the reason

12   that these cases have been filed.  If there had been an

13   agreement on what the FRAND rate is, this litigation would never

14   have arisen.

15           So the fact that there is an adversity here and the

16   issue is ripe, is clear.

17           The Motorola/Apple case in Wisconsin which has been the

18   subject of some of the briefing, and I wanted to clarify

19   something that -- a point which I don't think was quite

20   correctly stated in the reply brief of InterDigital.  They said

21   that case was ultimately dismissed because of a ripeness issue.

22   I would not characterize it in quite that way.  I think Judge

23   Crabb actually held that there was ripeness notwithstanding, at

24   that point, the absence of an essentiality finding.

25           The reason he dismissed the case was that Apple said

1    that it would pay a rate if it was less than one dollar.

2            And that's the problem that arose there.  It wasn't

3    whether the patents were infringed or essential or not.  It was

4    whether Apple would actually pay whatever rate that Judge Crabb

5    decided after a FRAND trial.

6            So the other -- and another impression, in the reply

7    brief -- and this is at Page 7 of InterDigital's reply brief as

8    to ZTE and Huawei -- they say that, We seek a license only --

9            THE COURT:  Mr. Young, I'm sorry.  Let me just go back.

10           When you're saying that Judge Robart, you know,

11   determined a reasonable rate, or range of rates that it was

12   going to use in the contract trial, was Judge Robart's deciding

13   this as a, you know, Count I Declaratory Judgment, here's a

14   reasonable; Count II, Breach of Contract, okay, now we are going

15   to take that determination from Count I and use it to try Count

16   II, so to speak?

17           Or I guess what I'm wondering is, if you have a Breach

18   of Contract case, and that survives, whether you have the

19   Declaratory Judgment or not, wouldn't he go through the same

20   process?

21           MR. YOUNG:  I'm not quite sure what you mean by "the

22   same process."

23           THE COURT:  Well, in other words, he's going to have a

24   Breach of Contract trial based on a count that says you breached

25   the contract.

1          Would he also have the bench hearing, before the Breach

2     of Contract trial, to determine a FRAND range of rates, so the

3     jury would have something to do?

4          In other words, what I'm wondering is, do what Judge

5     Robart -- I keep calling him Jason Robart -- what Judge Robart's

6     did, did he need to have a Declaratory Judgment count?

7          MR. YOUNG:  I think he needed to.  He thought it would

8     certainly be useful from a variety of standpoints.

9          There is the practical aspect of having the rate

10    declared to the extent that that is the major issue that divides

11    the parties.  It's a necessary part of what he will end up

12    doing, assuming the case gets there, which is just as in this

13    case, there is a Breach of Contract cause of action, which would

14    be part of the trial, and having the rate declared beforehand,

15    would allow the jury to be instructed as to a necessary factual

16    or legal issue that would govern that determination.  So there

17    -- there are a variety of -- I don't know the exact pleading

18    configuration in that case, but conceptually that's what he's

19    done.

20         THE COURT:  All right.

21         MR. YOUNG:  Going back -- and this is an issue again

22    correcting a statement of InterDigital in its reply brief at

23    Page 7 -- they say that we seek a license, quote, "only to valid

24    and infringed patents."

25         That's not correct.  If you look at our prayer at

1      Subparagraphs F and G, we seek a rate for all declared essential

2      U.S. patents, and we seek specific performance of a license by

3      InterDigital to combine --

4           THE COURT:  Well, I'm glad you mentioned that, because

5      one of the things that I was maybe a little confused about was,

6      I want to say and the various defendants saying things slightly

7      differently at various times.

8           It strikes me that -- well, is the -- somewhere along

9      the way -- I forget exactly where it was -- the document that

10     InterDigital sent to ETSI declaring at least two of these

11     patents, you know, may be essential was provided in the appendix

12     or something.

13          When you say "a rate for the declared essential

14     patents," are you saying anything that they have told ETSI, you

15     know, is or may be essential, and that they've committed to,

16     that they're prepared to grant?

17          So, basically, if that's the view, then it seems to me

18     there is no issue -- there's no finding or anything that I have

19     to make as to whether a particular patent is valid or invalid.

20          You know, there may -- and -- and I guess the way it

21     would work then would be, if you got a 3G phone, or a 4G phone,

22     or whatever it is, that it would be, in your view is, that would

23     be something every time you make one, sell one, or whatever it

24     is, you would have to pay the FRAND rate on that phone?

25          MR. YOUNG:  Yes, yes, your Honor.

1           And speaking for Huawei, the utility of the FRAND rate

2      determination would be that it would eliminate the need for the

3      Court to adjudicate infringement, and validity, and everything

4      else relating to those U.S. patents.

5           We would have a rate.  It would be paid.  And we would

6      have a license.  And, therefore, we would not have a need to go

7      through the rest of litigation with respect to all of those

8      other issues.

9           THE COURT:  Well, and... and, so, at various points in

10     this litigation, and maybe not this litigation, but the prior

11     litigation -- you know, I'm doing this based on memory, not on

12     reviewing transcripts -- I sensed a certain amount of waffling,

13     and, you know, maybe the different defendants have different

14     positions as to exactly how committed you were -- I mean all

15     three of you were to taking up a FRAND license.

16          And, so, part of it was because every now and then they

17     would be talking about valid and essential, and it is strikes me

18     that when people start talking about valid and essential,

19     there's a whole degree of -- it certainly makes your overcoming

20     your ripeness argument a lot harder.

21          I guess what I'm wondering is, I don't suspect

22     necessarily to have an answer in open court right here is, you

23     know, what you have -- because one of the things that might add

24     to conclusive -- you know, to all three of the ripeness factors

25     that if in the prior negotiations -- I sort of get the hint

1   about Nokia, but not so much about the other two companies --

2   that if you had, you know, outside of the judicial proceedings

3   said, If you give us a FRAND offer on your declared essential

4   patents, we will accept, which, you know, I'm not making any

5   final contract determinations here, but then it seems,

6   particularly in view of ETSI, that it would seem to me like that

7   would be a binding commitment.  And if they actually offered you

8   a FRAND rate, you would accept, you know, the...

9       MR. YOUNG:  Your Honor, for Huawei -- and I will let

10  the other defendants speak for themselves -- we do make that

11  commitment.  We have made that commitment here.

12      If this Court adjudicates a FRAND rate, we would pay

13  that rate for those patents that are the subject of our claim.

14      Now, for Huawei, in particular, I can give you a little

15  bit of history, which is that Huawei actually did seek a FRAND

16  rate from the Court in China and it obtained one.  And, again, I

17  can't get into the --

18      THE COURT:  Well, the court one in China, that would be

19  for Chinese patents?

20      MR. YOUNG:  That's correct.  And we are seeking the

21  same thing here in the U.S for the U.S. patents.

22      Huawei's position is, that it is willing, and it wants

23  to pay a FRAND rate for InterDigital's declared essential

24  patents.

25      It went to court in China to get an adjudication for

1     the rate of the Chinese patents.  It is willing to pay that

2     rate.

3           In the U.S., it is seeking from this Court, a

4     determination of the FRAND rate for the U.S. patents, and it is

5     willing to pay that rate.

6           InterDigital says, Well, you can always change your

7     mind.  I am not sure what more can we can do, other than to say

8     that we are seeking a judgment from this Court.  And we are the

9     ones seeking that judgment, so we would be bound by that

10    judgment.

11          And I suppose they could say, Well, you can always

12    refuse to pay the judgment.  I don't think that's a correct view

13    of things.

14          And we do seek and commit to pay a FRAND rate for the

15    U.S. declared essential patents that are at issue in this case,

16    as to which we have made the -- the claim.

17          THE COURT:  All right.

18          I'm sorry.  Is that the four patents in this case or is

19    that about the entire portfolio?

20          MR. YOUNG:  The whole portfolio is the subject of

21    our -- of our --

22          THE COURT:  Counterclaim.

23          MR. YOUNG:  -- Counterclaim.

24          There is the alternative of the Court.  I suppose, if

25    the Court would prefer to do this coming -- setting a FRAND rate

1      for the patents that are in negotiation --

2                THE COURT:  From the defendants?

3                MR. YOUNG:  I think we probably put that in our

4      pleading as an alternative, but we would --

5                THE COURT:  Okay.

6                MR. YOUNG:  -- we are seeking for the U.S. -- seeking a

7      rate determination for the U.S. declared essential patents, and

8      we would certainly take one for the patents that are in the U.S.

9      litigation.

10               THE COURT:  Okay.

11               MR. YOUNG:  In fact, I think Paragraph G of our prayer

12     for relief you will actually see a specific performance of the

13     license obligation for the combined asserted patents, which are

14     the twelve or so patents that are asserted in the litigation

15     that InterDigital has filed.

16               So on the conclusiveness issue, I think I agree with

17     your Honor's comments on conclusiveness.

18               There's already been a conclusive judgment, in our

19     view, in China, as to the utility issue.  Again, I would point

20     to the Microsoft case.

21               I note on their reply brief in the ZTE and Huawei cases

22     on Page 9, InterDigital says the following, quote -- and they

23     actually contrast with what the Ninth Circuit and Judge Robart

24     did in Microsoft and Motorola.

25               And their argument on utility basically is -- just to

1        bring you back -- the District Court Judge, Judge Robart, in

2        Microsoft said there's a dispute as to what the FRAND rate is.

3        There has to be some forum for resolving that dispute.  It's

4        resulted in patent litigation, and where there is no other

5        forum, it's going to be the Court.

6                THE COURT:  I'm not sure.  I guess there's a logic to

7        that argument.  I'm not a hundred percent persuaded.

8                MR. YOUNG:  Well, let me try to persuade your Honor

9        then.

10               There's obviously arbitration, which was the subject of

11       the Google and Motorola Consent Decree that we put before the

12       Court.  The Court is not the only third-party adjudication or

13       determination mechanism that exists.

14               But, in our view, there has to be some third-party

15       mechanism, in the FTC's view, whether it's arbitration or

16       litigation, it matters less.  There has to be some third-party

17       determination mechanisms where the parties just are unable,

18       between themselves, to come to an agreement as to what the FRAND

19       rate is.

20               THE COURT:  Well, that's -- you know, one of the things

21       I think one of the professors said -- maybe, you know, a lot of

22       stuff that I read about this is all jumbled up in my head --

23       I'm not sure where some of it comes from.

24               There's -- it would strike me that it's possible that

25       one interpretation of the ETSI standards is that -- and this

1    would be with Professor Aynes -- that it's a stipulation for

2    autri, and that it creates an obligation to negotiate in good

3    faith, which is two ways.

4          MR. YOUNG:  Actually, that's -- that latter

5    characterization is Professor Fages' view.  I think the

6    stipulation for pour autrui -- and of my French is not as good

7    your Honor's -- it actually goes beyond just an obligation to

8    negotiate, but that's --

9          THE COURT:  Well, it requires an obligation to offer

10   FRAND terms.  The way I think -- and I think I have the

11   professor right, but maybe I don't -- but things like FRAND

12   terms, they are not a scientific principle.  There's a range of

13   possible rates, and there are other factors, and part of what

14   was interesting about the ITC thing was Samsung and Apple.  You

15   know, they were negotiating cross-licenses, you know, various

16   things were thrown into the mix.

17         So if InterDigital makes an offer, you know, my

18   impression right now is that they are required to make an offer.

19   Then there would be some negotiation.

20         And, ultimately, neither party dictates the terms of

21   the negotiation.  And if they make an offer or, you know, if the

22   parties negotiate a bit, and in the end the parties disagree,

23   then it's not necessarily the case that there's some Court

24   somewhere that is then supposed to finish the parties'

25   agreement.  Maybe all the Court's job to do is to determine

1    whether the offer that they made, that you didn't accept, was a

2    FRAND offer.

3         MR. YOUNG:  I don't think that's quite right, your

4    Honor, and I will point, again, to the Microsoft case.

5         There the Court did enjoin Motorola's enforcement of a

6    German injunction.  And, as Mr. Flinn intimated earlier this

7    morning, we may be in a position, if we get there, where we need

8    to come back to the Court to enforce what we believe to be an

9    obligation of InterDigital to license, which is antithetical to

10   stopping.  It's not antithetical to receiving compensation under

11   FRAND terms.  In fact, that's what we are seeking to pay

12   InterDigital.

13        But I don't think it's the case that under the ETSI

14   FRAND obligation -- and this is the subject of Professor Aynes'

15   Declaration, that if the parties disagree, there's no recourse

16   and --

17        THE COURT:  Well, no.  There is a recourse.  But it's

18   not the recourse of the Court figuring out what the FRAND rate

19   should be.

20        In other words, the two of you -- you know, the

21   stipulation pour autrui, the way that the professor whoever was

22   talking about it says was, They're obligated to make an offer.

23        You're not obligated to accept it, right?

24        MR. YOUNG:  Well, the obligation is to make available

25   the license on FRAND terms.

1            THE COURT:  Right.  So they say, Here they are in FRAND

2     terms, that's what they're required to do by ETSI.

3            You're not required to accept.

4            MR. YOUNG:  I think what would happen if were a FRAND

5     offer made, and the defendant's potential licensee refused to

6     accept it, then it may be that --

7            THE COURT:  Then probably the next step is they sue you

8     for patent infringement?

9            MR. YOUNG:  Yes, that's certainly true.

10            But there needs to be a determination of whether it's a

11     FRAND offer or not.

12            THE COURT:  Right.  Right.  But that's a different

13     thing determining whether a particular offer was made in the

14     past is a FRAND offer than, you know, setting a range.  Maybe

15     there's a certain amount of overlap in how you get the end

16     result, but it's kind of a -- it seems to me to be a different

17     thing a Court determining whether past conduct breached a

18     contract, which is really, if they didn't make you a FRAND

19     offer, is arguably what they were doing.

20            And something -- and then -- but it's a much different

21     thing to say, Okay, they didn't make you any offer at all, or

22     they made you an offer that was clearly not a FRAND offer, and

23     here's what the FRAND offer should be.

24            MR. YOUNG:  Well, our view -- and we'll get to the

25     particulars of this -- is that the offers that InterDigital has

```
1    made clearly are not FRAND offers.

2            THE COURT:  No, no, I gathered that.

3            MR. YOUNG:  Okay.  And Mr. Flinn is willing address

4    Professor Aynes, but I --

5            THE COURT:  Well, actually, I forget.  I think I have

6    something at 10:30.

7            (A discussion was held off the record.)

8            THE COURT:  I think we need to wrap this up.  I

9    apologize.

10           MR. YOUNG:  Well, my only point in closing then, I

11   would point your Honor to the Stepsaver case, which is the Third

12   Circuit case that sets forth the three parts of the ripeness

13   issue.

14           It notes something from the Declaratory Judgment Act

15   legislative history, which is that under the prior -- the pre-

16   Declaratory Judgment Act law, you take a step in the dark and

17   then turn on the light to see if you stepped in a hole.

18           Under the Declaratory Judgment law, you turn on the

19   light, and then take the step.

20           What we are seeking here is a Declaratory Judgment that

21   would guide the parties and guide the Court, actually, in its

22   subsequent decision-making as to what the FRAND rate should be,

23   and I think under the Third Circuit law, we are entitled to do

24   that.

25           Thank you, your Honor.
```

 1                    THE COURT:  All right.

 2                    Thank you, Mr. Young.

 3                    Mr. Flinn, do you have something --

 4                    MR. FLINN:  Sure.

 5                    Paragraphs 26 and 27 I think state the relief that

 6          Professor Aynes says are available, and he specifically says --

 7                    THE COURT:  What's the paragraphs?

 8                    MR. FLINN:  Paragraph 26 of his Declaration.

 9                    THE COURT:  Hold on a second.

10                    (Pause)

11                    Okay.  Your Declaration in the Nokia case --

12                    MR. FLINN:  Yes, document 28.

13                    THE COURT:  -- rather than the other case at hand.

14                    So I don't actually have that Declaration sitting in

15          front of me, so tell me about it.

16                    MR. FLINN:  I'll tell you, and I'll pass up my copy to

17          your Honor, so you can try to find it later.

18                    Paragraph 26 says, "The Declaration made in Clause 6.1

19          of the ETSI rules" -- describe it and then says -- "without any

20          reservation, obliges the declarant to grant the said license."

21                    Then he goes on to say, "Under French law if a promisor

22          under a stipulation pour autrui fails to provide the promised

23          benefit, it is undisputed that the beneficiary is entitled, as a

24          remedy, to have the promisor actually confer the benefit

25          promised.  This would be equivalent to a specific performance

1    under U.S. law."

2              And, so, Professor Aynes does say that we are entitled

3    to get that license, and that requires setting a FRAND rate.

4              Then the question what about the periphery?

5              I don't think there is going to be a dispute about

6    peripheral issues, because the parties have had drafts that will

7    be in the trial record back and forth on the other terms, on the

8    peripheral terms, and there is very little disagreement on

9    those.  It's all about the FRAND rate.

10             But if there's some important dispute, then that could

11   probably be resolved as well, if the turns on FRAND.

12             THE COURT:  All right.

13             So I'll give Mr. Steuer a couple minutes to respond.

14             MR. FLINN:  Your Honor, I'll give you --

15             THE COURT:  It's an unmarked copy.

16             MR. FLINN:  It's Document 28 from our case.

17             THE COURT:  Hold on just a second.

18             (Pause)

19             All right.

20             MR. STEUER:  I think you've been very generous with

21   your time, so I'll try to be brief.

22             First, as was pointed out in your colloquy with Mr.

23   Young, what the defendants are asking for here is not what's

24   happening in the Walker Digital of Washington.  They are asking

25   the Court to create a license.  That's not what Judge Robart was

1     doing.

2          Judge Robart essentially made a pretrial ruling for the

3     use of the jury, when it goes to the jury on a Breach of

4     Contract claim.

5          What some of the plaintiffs are asking for, what the

6     counterclaim plaintiffs are asking for, they're asking for this

7     Court to write a contract, write a license for the parties.

8          And this is the dark side of the moon.  No Court has

9     done that and it shouldn't be done.  It is unwieldy.  It's just

10    not a good idea.  I don't think it's ripe.  I don't think it's

11    within -- I don't think it's in the Court's sound discretion to

12    take over this commercial bargaining between the parties.

13         Mr. Flinn said that, Yeah, there might be 500 patents.

14    There might be 500 applications.  We can boil them down into

15    groups but there are still hundreds of patent families.  So you

16    can boil it down a little bit, but it's still quite a big dish.

17         THE COURT:  But it's something -- and, you know, I'm

18    not asking for confidential information here -- some of the

19    companies, I presume, have asked InterDigital, We'd like to

20    license our U.S. deemed essential patents, and InterDigital has

21    made them some offer for the entire package, right?

22         MR. STEUER:  I --

23         THE COURT:  I'm not saying, necessarily, these

24    companies, but some companies?

25         MR. STEUER:  My understanding is, no, that is not part

```
 1        of the licensing program of InterDigital, nor of the other

 2        parties.  It's not just the way the industry works.

 3               THE COURT:  So it's just on a patent-by-patent basis?

 4               MR. STEUER:  Well, maybe many years ago there was an

 5        offer to license patents.  I would say about ten years ago.

 6        That hasn't been a part of the program for many years, and the

 7        program is a worldwide license.

 8               Now, occasionally, there are a few worldwide licenses,

 9        very few, that have different rates for different countries.

10        But, generally speaking, the practice of InterDigital, as is the

11        industry practice, is to license on a worldwide basis.

12               Obviously I could get into the individual licenses, I

13        suppose, if there was a closed session and the Court asked me

14        to, but --

15               THE COURT:  Right.  I'm not asking you to.

16               MR. STEUER:  Yes, okay.

17               The Court asked the questions, or proposed it, perhaps,

18        an early trial on FRAND rates would obviate further proceedings,

19        but that's not case at all for a couple of reasons.

20                One is that all the plaintiffs are -- all the

21        defendants are resisting liability on the '970 and '244 patents,

22        neither of which are declared essential, much less essential to

23        3G or 4G standards, so a trial has to go forward on those

24        patents at the very least.

25               THE COURT:  I'm sorry.
```

1               Do the defendants agree on that?

2               MR. FLINN:  Not entirely, your Honor, because at least

3       the '970, which is actually in our case rather than in theirs,

4       was declared to -- it's not the case.  We can't concede to it

5       sitting here, your Honor.

6               THE COURT:  All right.

7               Go ahead, Mr. Steuer.

8               MR. STEUER:  Well, in any event, Nokia stated that they

9       will only pay for a license for patents that are actually

10      essential, valid, and infringed.

11              So you would actually have to -- the jury would have to

12      make that finding, in any event, because Nokia's conditioned any

13      willingness to enter into a FRAND license imposed by the Court

14      on that.

15              THE COURT:  Well, let me just ask, because I did

16      understand what Mr. Young said.

17              Mr. Flinn, is Nokia's position different --

18              MR. FLINN:  I disagree with his characterization of our

19      position, your Honor.

20              THE COURT:  All right.

21              MR. FLINN:  I can tell you what our position is

22      affirmatively.

23               THE COURT:  Well, just tell me in a sentence.

24              MR. FLINN:  Sure.

25               We will accept, as a binding FRAND rate for their

1        declared patents, whatever your Honor says it is.  Whether they

2        are valid or essential, that's the rate.  And if we want to

3        license those patents, that's the rate we have to pay.  And if

4        we don't, we are not really a licensee and we will be excluded.

5              The question of whether they are valid or -- or -- or

6        their length and scope, may be one the data points that your

7        Honor considered in figuring what the rate is.

8              But it's declared essential portfolio that that rate

9        applies to and that would be the license rate that Nokia would

10       pay.

11             THE COURT:  All right.

12             Is that ZTE's position to?

13             MR. REIZISS:  Yes, your Honor.

14             THE COURT:  Okay.  All right.

15             Go ahead, Mr. Steuer.

16             MR. STEUER:  I would just say that is certainly not

17       what Nokia has pled.  I didn't actually hear Mr. Flinn say what

18       he would pay.  In any event, the Court can take a look at what

19       they pleaded on that.

20             Mr. Flinn suggested, Well, you don't have to worry

21       about ETSI, because there are also Declarations to the ITU, and

22       that's not French law.  Forget these French guys.  Just look at

23       the ITU Declaration that an individual made as to their CDMA

24       patents.

25             But what the ITU Declaration says is that the party

```
1        making the Declaration is willing to negotiate worldwide

2        licenses, so, if anything, it's even more harmful to them, to

3        their position that the Court could find a Breach of Contract

4        here than in the ETSI.

5             THE COURT:  Well, isn't their Breach of Contract claim

6        based on ETSI and not on ITU?

7             MR. STEUER:  Well, Mr. Flinn said, no, you could

8        sustain it based on the ITU Declaration.

9             THE COURT:  I thought he was talking about the

10       Declaratory Judgment there.  Maybe not.

11            Mr. Flinn, is your Breach of Contract claim based on

12       ETSI and ITU?

13            MR. FLINN:  The answers is, yes, and their ITU

14       Declaration says that they are prepared to grant, not just that

15       they are prepared to talk.

16            THE COURT:  All right.

17            So the Breach of Contract with ITU, that's a separate

18       Breach of Contract from the ETSI Breach of Contract?

19            MR. FLINN:  Yes, your Honor.

20            THE COURT:  All right.

21            I see your brain trust sitting behind you.

22            MR. FLINN:  Yes, yes.  I can do nothing without Mr.

23       McCarty, your Honor.  I'm simply a mouthpiece.

24            THE COURT:  A very convincing one.

25            But your ITU and your ETSI Breach of Contract, they are
```

1        in the same count?

2                MR. FLINN:  That's correct.  Yes, your Honor.

3                THE COURT:  All right.

4                Thank you.  All right.

5                Go ahead, Mr. Steuer.

6                MR. STEUER:  Okay.  With respect to the U.K.

7        litigation, where certain patents were at issue, and this was

8        actually settled on appeal, so I don't know how much you could

9        draw from that -- with respect to the Chinese case that Huawei

10       brought in their backyard Shenzhen, frankly, we think that was a

11       proceeding that was profoundly unfair, as we have not hidden our

12       belief on that.  It was decided by a political panel within the

13       courthouse in Shenzhen.

14               Whatever happened in China, which we think was very

15       bad, and very unfair, should really not form this Court's

16       decision here.

17               By the way, the Court in China specifically said that

18       they would not follow French law and ETSI, and instead followed

19       Chinese law.

20               And in terms of -- I know the Court has shown interest

21       in the negotiating history, and there is quite a bit of it.  In

22       fact, I don't know if it is clear to the Court, Nokia and

23       InterDigital did have a license until 2006.  It's only been

24       since then that the parties have been unable to reach a license.

25       There is quite a bit of history here.

1                This is not a negotiation.  And, frankly --

2                THE COURT:  And -- I mean I am correct in thinking that

3       everybody, all the parties in this courtroom, actually want to

4       conclude a licensing agreement.  They just have a different idea

5       as to what it should be?

6                MR. STEUER:  Well, I think -- I think that's generally

7       true.  Sometimes I wonder about ZTE, frankly, but I think that's

8       basically correct.

9                THE COURT:  All right.

10               MR. STEUER:  I know that all -- I can say -- and I

11      don't think I'm stepping over the line here -- is that all the

12      parties have been actively negotiating within the recent period.

13               THE COURT:  Well, I mean it just -- it just seems to

14      make -- you know, as I said, the idea of what the terms may be,

15      and even the scope may differ, but clearly you want to license

16      your patents for as much as money as you can, and they want to

17      get the licenses for as little money as they can, more or less?

18               MR. STEUER:  Well, InterDigital only business is

19      licensing patents.

20               THE COURT:  Right.  And I'm not saying there is

21      anything wrong with any of this.

22               Okay.  Anything else?

23               MR. STEUER:  Just one quick point.  It may sound like a

24      technical issue and I suppose it is, but I think it's

25      significant in this context, which is the parties want a license

1     to declare essential patents.  And I don't believe they can

2     point to any authority that says there is any compulsion to

3     license a patent, or intellectual property right that may be

4     declared as potentially essential, but not, in fact, essential

5     for the practicing standards.  If it's not the essential to

6     practicing standards, that means the party is free to practice

7     the standard without it.

8          THE COURT:  And, so, are you saying that you'd like

9     these patents, where your client said something, saying, may or

10    is essential, they are not deemed essential patents?

11         MR. STEUER:  That's correct.  A further inquiry has to

12    be made, because at the time that you are making the

13    Declarations, you're not sure, for example, exactly where the

14    standard is going to go, and you're not --

15         THE COURT:  Is there some -- did one of the professors

16    says, just because you -- that language means that you can

17    waffle on whether the thing is actually deemed an essential

18    patent?

19         MR. STEUER:  Well, I don't think it's a question of

20    waffling.  It's a question of not knowing at the time that you

21    submit the IPR, in fact, the IPR will rest on that patent.

22         THE COURT:  Well, at least the ones that you brought

23    suit on here, you kind of said they're essential.

24         MR. STEUER:  Yes.  Well, we believe they are essential

25    except for two of them, which we don't believe are essential;

1        the '970 and the '244.

2               THE COURT:  And you're saying you didn't file the --

3        that there may be essential paperwork on those two, or you did

4        file it, but now you don't believe it's accurate?

5               MR. STEUER:  We did not declare them on the 3G or 4G

6        patent as being -- as maybe essential.  They are not declared.

7               THE COURT:  Okay.  Okay.

8               MR. STEUER:  So on the French law, I think what was

9        said about Professor Aynes is wrong, but I think we probably

10       talked enough about the vagaries of French law.

11              But I think if you look at the particular paragraphs

12       that Mr. Flinn was referring to, and put it in context, it's not

13       really making the conclusion that he wants to draw, which is

14       there is a binding obligation to license.  It's in a different

15       context.

16              THE COURT:  It's quarter to 11:00.

17              MR. STEUER:  Thank you.

18              THE COURT:  All right.

19              Let's see what I can do here.

20              As to all of these motions to strike the counterclaims,

21       on the question of whether the FRAND Declaratory Judgment claims

22       or the compulsory counterclaims should not be allowed in this

23       suit because they are also -- because they were compulsory

24       counterclaims in the earlier suit, I don't think I accept that

25       argument.

1           In its opening brief in the Huawei and ZTE cases,

2     plaintiffs cited two cases; Nokia v. InterDigital from the

3     Southern District of New York on March 5th, 2009, and in Avanti

4     v. Hart in the Southern District of Illinois on July 31st, 2009.

5           I don't think those cases bear any resemblance to what

6     we have here.  It seems to me, in every practical sense, this is

7     the first opportunity the defendants have to file these

8     counterclaims.

9           You know, the law allowed them to seek a stay in the

10    other case, and once the stay was there, I would not allow them

11    to file a counterclaim there, so I don't think they forfeit the

12    ability to bring the counterclaims.  This really is the first

13    suit in which can they can do it.

14          And, to the extent these other cases, you know, there

15    are a lot of them based on the first filed rule where there are

16    suits in two different Courts, here they're all in front of me.

17    So the first argument of InterDigital, I reject that.

18          What I'm going to do, I think about the rest of it is,

19    I'm going to grant InterDigital's Motion with Leave to Amend.

20          And one thing we need to figure out is how to amend it

21    to get around these nondisclosures agreements that you have,

22    because I think -- I think to make your -- I think both for the

23    Breach of Contract sort of generally, and the Declaratory

24    Judgments, I think that there's a lot of key things that are

25    sort of conclusory stated.

```
 1              And I think there needs to be more factual allegations.

 2     And I think, in particular, the factual allegations that I was

 3     puzzled about, when I didn't see them, were the ones kind of

 4     about the negotiation licensing history and the offers and

 5     counter-offers.  And, you know, maybe I skimmed, maybe I

 6     overlooked this, but to some extent -- you know, I think the --

 7     I think really the more detailed the better, particularly for

 8     the question of the Declaratory Judgments.

 9              I think the Breach of Contract -- you know, I think

10     there's some more detail that is required, but maybe not so

11     much.  And, so, so I think that the counterclaims can

12     theoretically stay the Breach of Contract, and the Breach of

13     Contract will have a third-party beneficiary, which is what I

14     think Judge Koh said in Apple v. Samsung, 2012 Westlaw, 1672493

15     at 913, Northern District of California, May 14th, 2012.

16              I've read the competing Declarations of Professor Fages

17     and Aynes.  I think, for what it's worth, I reserve the right to

18     change my mind later on, but at least based on -- and I do want

19     to talk about getting an independent expert -- but at least

20     reading them right now, I think Professor Aynes has the better

21     of the argument.  The contract is a stipulation for autrui.

22              What I got from the Professor Fages' Declaration -- and

23     I certainly am not prepared to say that I don't agree with any

24     of it -- in fact, I think he's -- I think he's right that the

25     negotiations need to occur.
```

1              I interpret him not necessarily exactly the way Mr.

2       Flinn said it, but that I thought what he said was that the only

3       requirement was that negotiations be in good faith.  I think he

4       said both sides needed to negotiate in good faith and I think a

5       that makes sense.

6              But I think he -- what he was saying there is no

7       restriction other than good faith, I think there is another

8       restriction, which is that the licensee needs to have FRAND

9       terms.  And, so, maybe -- maybe it wasn't clear to me.  Maybe

10      good faith, under the circumstances, just includes FRAND terms.

11             But, I mean, there is a reference point, which is that

12      -- which is this FRAND requirement.  When I read the answers,

13      and now I understand why some of the things that I thought I

14      might see in there are not there, it was hard for me to tell

15      even on a factual basis, whether particularly Huawei and ZTE

16      even initiated the negotiations.  From what I've heard now, I'm

17      quite convinced that it could be pled that there has, in fact,

18      been negotiations.

19             So I think the requirement that there be a FRAND offer

20      seems to me it can be pled that it's on the table.

21             The -- let me just address -- there are various claims,

22      for example, in the Huawei and ZTE, the equitable estoppel and

23      waiver of rights to enjoin, and there is similar things, the

24      promissory estoppel claims in the Nokia answer.

25             It seems to me Judge Koh said it.  Professor Fages said

```
 1        it.  It seems like estoppel under French law is very limited.

 2                So I'm going to strike those, but not give you leave

 3        replead them.

 4                And, so, that leaves the question of the Declaratory

 5        Judgments, and what I think is, we do have the Third Circuit

 6        standard which for ripeness, the Court says that we focus on

 7        adversity of interest between the parties, the conclusivity that

 8        the Declaratory Judgment would have on the legal relationship

 9        between the parties, and the practical help or utility of a

10        Declaratory Judgment.

11                To some extent, I really do think the most important

12        thing for me, in both determining whether the case is the FRAND

13        and Declaratory Judgment claims are ripe, and then the secondary

14        discretion they're questioning, even if they are ripe, or when I

15        should hear them, is the history of the parties in the

16        negotiations, which, as written -- and, again, I understand why

17        it's written that way now, is just very conclusory.

18                And, so, I tend to think that if -- and without even

19        having completely thinking about it 100 percent through, that

20        each of the defendants could have triggered the obligations, or

21        what I believe are the obligations of the plaintiffs, to make a

22        FRAND offer.  But I think it's important to know whether the --

23        whether the preceding negotiations were about two of the four

24        patents that are in this suit, or the entire U.S. portfolio, or

25        what they were.
```

1          I also think it's important -- and I really think with

2     the sort of -- or what is laid out in the Samsung v. Apple

3     opinion from the ITC that I was given yesterday, you know, what

4     other considerations would be put forth, back and forth.  And

5     presumably since it is InterDigital's licensing company, and not

6     a telephone manufacturing company, we are not talking cross-

7     licenses here, but the issue about the worldwide license, which

8     at least from what I'm hearing right now, actually strikes me as

9     probably the -- at least possibly the biggest stumbling block

10    between the parties.

11         I think the history of negotiations would frame what is

12    a reasonable Declaratory Judgment assertion, and, so, that's

13    what I think needs to be pled.

14         On the subject of the promissory estoppel, or equitable

15    estoppel, I would say the Chinese defendants sort of have gone

16    on French law, which I think is pretty clear that there is --

17    that estoppel is extremely limited.

18         I think Nokia was saying that something other than

19    French law ought to govern, but it seems to me that the whole

20    issue is coming out here is for the most part out of ETSI's

21    policy, and that the agreement has a choice of law clause, and,

22    so, really it's French law that does control.

23         And I think that it also applies that French law

24    doesn't recognize an applied license either, so, generally, I

25    would agree then with Judge Koh's decision from the Northern

1          District of California.

2                  In terms of Nokia, it also has an unfair competition

3          claim, and because it seems to me that the supposed unfair

4          competition is occurring outside of California in the ITC

5          proceedings, and because I don't think California law applies to

6          extra-territorial acts by foreign companies, I'm going to

7          dismiss that claim without leave to amend.

8                  It's possible that I haven't addressed every --

9          particularly every Nokia claim here, because there were more of

10         them, but I will enter some order that addresses specifically

11         each count.  But I wanted to -- but I'm not going through -- I'm

12         not going to offer any more of what I think about this.

13                 I think based on an hour-and-three-quarters of

14         argument, and have what I said, I think I've -- I hope that I've

15         given you an idea of what I'm thinking right now, and that --

16         and, so, I think there are a couple of things we need to

17         determine, which is what I really like to see is -- I'd like to

18         see amended answers that include information right now you can't

19         provide me, because of non-disclosure agreements.

20                 So that implicates a timing circumstance.  That also

21         implicates how you're going to get out from these non-disclosure

22         agreements.  It also implicates the fact that I think the

23         various defendants are probably going to have to file parts of

24         their answers under seal, and under seal from each other, too.

25         Probably.  Maybe not.

1            How would you suggest addressing this?

2            MR. FLINN:  Here's my thinking on it, your Honor.

3            We can provide amended answers in 20 days.  Amended

4    answers to the counterclaims in 20 days.

5            We would propose that we file two versions; a public

6    version and a confidential version.

7            This is presuming the Protective Order will have been

8    entered by that time, and it will certainly will be, such that

9    the private version would be filed and only served on opposing

10   counsel with outside counsel only.

11           We would redact the minimum necessary from the --

12           THE COURT:  Kind of like the ITC?

13           MR. FLINN:  Yes, exactly.

14           And we will file a Motion and Declaration to file the

15   version under seal, demonstrating the good cause for filing it

16   under seal with the Declarations, explaining the confidentiality

17   and importance of maintaining the confidentiality.

18           THE COURT:  Yes, and probably InterDigital will be able

19   to agree, and that would be -- I'm not saying you have to -- but

20   it seems that you probably ought to agree to that, and then it

21   could be submitted as a stipulation.

22           MR. STEUER:  I haven't heard anything that we can't

23   work it out.

24           MR. FLINN:  The confidentiality issues are contractual

25   between the parties and they have as much interest in keeping

1     them confidential as we do.

2              THE COURT:  Right.  I don't suspect that to be a

3     problem.

4              Yes, that sounds fine.

5              So, basically, then... all right.

6              And I should mention, just to the extent that you can,

7     the assertions about the non-discriminatory aspects that there

8     has been licensing to by InterDigital to other -- presumably

9     your competitors -- if there is anything -- you know, if there

10    is any actual factual information to put in about that, to give

11    me an idea.

12             MR. FLINN:  We certainly can.

13             THE COURT:  All right.  All right.

14             Anything else?

15             MR. FLINN:  No.  I will say that the 20 days is going

16    to be predicated on this Protective Order getting entered very

17    promptly.  But I think we have a form, and it is about to be

18    entered, too, and we'll probably be okay there.

19             MR. STEUER:  Yes.  I just want to make sure.

20             So we need the Protective Order and we need the order

21    on the cross use, and it will be good if we could have a chance,

22    after the confidential version is filed, to take a look at the

23    redaction before the public?

24             MR. FLINN:  Yes.  What we can do is this, your Honor:

25             Let's make it within 20 days we will serve on them our

1        proposed private confidential ones, and they will get five days

2        to decide if they have problems with what we've redacted.  So

3        that on the 25th day, we would actually file the two documents,

4        if that's okay with counsel?

5                THE COURT:  All right.

6                MR. STEUER:  That's good.

7                THE WITNESS:  Let's do one other thing, which is, if

8        you are not sure that the Protective Order will be entered by

9        then, why don't we just have something that says, if it is

10       not -- if the Protective Order is not entered, you're going to

11       either serve it on them after 20 days, or after the Protective

12       Order is entered, plus seven days, whichever occurs second?

13               MR. FLINN:  Yes.  That works out fine for us.

14               THE COURT:  Okay.

15               Anything else?

16               MR. STEUER:  Not from the plaintiffs.

17               MR. FLINN:  Not from Nokia.

18               MR. YOUNG:  Nothing more for Huawei

19               MR. REIZISS:  Not from us, your Honor.

20               THE COURT:  All right.

21               Great job, Mr. Reiziss.

22               THE COURT:  Okay.  We'll stand-in recess.

23               Hopefully, maybe not today, but I will get an order

24       entered and I look forward to hearing from you.

25               (The proceedings adjourned at 11:04 o'clock a.m.)

1                                    *   *   *

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25